320 S.E.2d 345

**STATE ex rel. VAPOR CORPORATION, etc., et al.**

v.

**Steven D. NARICK, Judge, etc.**

No. 16119.

Supreme Court of Appeals of West Virginia.

July 12, 1984.

Jolyon W. McCamic, McCamic & McCamic, Wheeling, for appellant.

Grogan, Graffam, McGinley, Solomon & Lucchino, Pittsburgh, Pa., Morris & Ruley, Parkersburg, for Mobay.

Bachmann, Hess, Bachmann & Garden, Wheeling, Egler, Anstandig, Garrett & Riley, Pittsburgh, Pa., for Air.

Mead, Goodwin, Saad & Shanley, Wheeling, Grigsby, Gaca & Davis, Pittsburgh, Pa., for IVS Hydro Inc.

MILLER, Justice:

The petitioners in this original action in prohibition seek to prevent the Circuit Court of Marshall County, West Virginia, from continuing an order, which set aside a settlement agreement among several defendants in a wrongful death action, on the grounds of public policy. After reviewing the terms of this agreement, we conclude that it does not violate the public policy of this State. We also reject the arguments, raised for the first time in this court, that the agreement is "barred by fraud" or prohibited under the law of Pennsylvania. Accordingly, we issue the writ of prohibition.[1]

The petitioners have been collectively styled by the parties as the "vendor defendants," because they supplied another defendant, Air Products & Chemicals, Inc. (hereinafter Air Products), with various items of machinery and equipment which it used in an air separation plant owned by Air Products. This Air Products facility supplied oxygen and nitrogen to an adjoining plant of Mobay Chemical Corporation (hereinafter Mobay).

The accident giving rise to the underlying litigation occurred on January 31, 1978, when a liquid nitrogen tank at the Air Products facility ruptured as a result of overpressurization. Part of the tank's outer shell broke off and struck a pipeline running from a nearby liquid oxygen storage tank. The impact was transmitted up the pipeline toward the tank, causing the outlet nozzle to break off. A substantial quantity of liquid oxygen escaped from the tank and vaporized, forming a cloud that drifted onto a remote portion of the Mobay property. Five persons working at the Mobay facility sustained fatal injuries when they entered the cloud and caught fire. As a further result of the oxygen spill, the Mobay and Air Products facilities were shut down and evacuated, causing property damage and business interruption losses.

The 1978 accident spawned a number of suits in three different states. Mobay was the first party to file a claim, initiating a lawsuit in the Court of Common Pleas of Allegheny County, Pennsylvania, against Air Products for property damage. In that suit, Air Products filed third-party claims for contribution or indemnification against the vendor defendants apparently on a products liability theory.

1. The respondents do not argue that we lack jurisdiction in prohibition, apparently satisfied that this issue meets the standard set in Syllabus Point 1 of *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979).

Following the Mobay action, three wrongful death suits were filed in Pennsylvania and Ohio, naming Mobay and Air Products as codefendants. In each of these actions, Air Products impleaded the same group of vendor defendants as in the Mobay action, asserting the same theories of indemnification or contribution.

Finally, two wrongful death claims, *Henry v. Air Products & Chemicals, Inc.*, Civil Action No. 79–C–418N, and *Rodriguez v. Mobay Chemical Corp.*, Civil Action No. 79–C–490N, were filed in the Circuit Court of Marshall County, West Virginia. Apparently inspired by the Air Products third-party complaints filed in the Ohio and Pennsylvania cases, the plaintiffs in these suits sued not only Mobay and Air Products, but all of the third-party vendor defendants in the earlier actions.

After extensive pretrial discovery conducted simultaneously in all of the cases, Air Products entered into a comprehensive settlement agreement with all of the vendor defendants except I.V.S. Hydro, Inc., (hereinafter I.V.S.). The agreement provided for the mutual settlement and release of all cross-claims for contribution or indemnity that might arise among the settling parties. In addition, Air Products agreed to indemnify, defend, and hold harmless the vendor defendants against any judgment rendered against them in favor of the plaintiffs or any of the nonsettling defendants.

Mobay and I.V.S. filed motions to set aside this agreement. After conducting a hearing on the motions and examining the agreement, the Circuit Court of Marshall County on December 16, 1983, entered an order granting these motions in the *Henry* and *Rodriguez* cases,[2] stating that the agreement tends "to undermine the adversarial matter [sic] of judicial proceedings, ... is disruptive of the orderly process of discovery and litigation; and is in violation of the public policy of this state." No explicit reasons were given in support of these conclusions.

The respondents assert several grounds for sustaining the circuit court's action. One of the major claims is that the agreement chills the adversarial process by placing Air Products in charge of representing the vendor defendants, thus giving it the opportunity to manipulate the defense for the vendor defendants to its advantage. Intertwined in this argument are ethical considerations and an overall appeal that such an agreement violates public policy. In support of this position, we are cited cases which involve what have become known as "Mary Carter agreements," a name taken from *Booth v. Mary Carter*, 202 So.2d 8 (Fla.Dist.Ct.App.1967), *overruled*, 284 So.2d 385, 388 (Fla.1973). This term of art was defined in *Vermont Union High School Dist. No. 21 v. H.P. Cummings Constr. Co.*, 143 Vt. 416, 469 A.2d 742, 748 (1983), as follows:

"In essence, a Mary Carter agreement is a contract by which one or more defendants in a multi-party case secretly align themselves with the plaintiff and agree to continue as active defendants in the suit while working to aid in the plaintiff's case; in exchange, their own maximum liability will be diminished proportionately by increasing the liability of the nonagreeing defendant or defendants.... The agreements themselves take a variety of forms; however, four features are commonly considered to be essential:

1. The agreeing defendants must remain in the action in the posture of defendants.

2. The agreement must be kept secret.

3. The agreeing defendants guarantee to the plaintiff a certain monetary recovery regardless of the outcome of the lawsuit.

4. The agreeing defendants' liability is decreased in direct proportion to the increase in the nonagreeing defendants' liability."

*See also Frier's, Inc. v. Seaboard Coastline R.R. Co.*, 355 So.2d 208, 210 (Fla.Dist.

2. The *Rodriguez* case was settled sometime after a petition for prohibition was filed with this

Court.

Ct.App.1978); *General Motors Corp. v. La-Hocki,* 286 Md. 714, 720, 410 A.2d 1039, 1042 (1980); *Cox v. Kelsey-Hayes Co.,* 594 P.2d 354, 357 (Okla.1978); *Grillo v. Burke's Paint Co.,* 275 Or. 421, 425, 551 P.2d 449, 452 (1976). Although the validity of such agreements is a matter of some controversy among courts and commentators alike,[3] a number of jurisdictions have upheld Mary Carter agreements where certain procedural safeguards have been employed.

■ While recognizing that the agreement in the present case differs from the usual Mary Carter arrangement, we establish as a beginning point that this type of settlement agreement must be promptly disclosed to the court and opposing counsel.[4] The parties do not discuss this point, but most courts in considering the validity of Mary Carter and related settlement agreements hold that prompt disclosure is required to both the court and opposing counsel once such a settlement is made.[5] *See Mustang Equip., Inc. v. Welch,* 115 Ariz. 206, 211, 564 P.2d 895, 900 (1977); *Gatto v. Walgreen Drug Co.,* 61 Ill.2d 513, 523, 337 N.E.2d 23, 29 (1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1669, 48 L.Ed.2d 178 (1976); *Johnson v. Moberg,* 334 N.W.2d 411, 415 (Minn.1983); *Cox v. Kelsey-Hayes Co.,* 594 P.2d 354, 359–60 (Okla.1979).

Disclosure is required because such settlements frequently tend to realign the loyalties of the parties and change their trial tactics from what normally would be expected. It is critical to the fair conduct of the trial to disclose the settlement terms so that the court, with the assistance of counsel, may decide whether the agreement is valid, and if so, what measures should be taken to ensure that the nonsettling party or parties will not be prejudiced.

■ Furthermore, we agree with the respondents' assertion that while the law favors settlement, such agreements are subject to judicial scrutiny under Syllabus Point 1 of *Sanders v. Roselawn Memorial Garden, Inc.,* 152 W.Va. 91, 159 S.E.2d 784 (1968):

> "The law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy."

We do not believe that the agreement in the present case is analogous to the traditional Mary Carter agreement. Two of the ingredients are missing. First, there is no agreement with the plaintiff, although we recognize that Air Products, as a third-party plaintiff or cross-claimant on claims

**3.** The literature on Mary Carter agreements includes the following articles: Freedman, *The Expected Demise of "Mary Carter:" She Never Was Well,* 633 Ins.L.J. 602 (1975); Michael, *Mary Carter Agreements in Illinois,* 64 Ill.B.J. 514 (1976); Note, *Are Gallagher Covenants Unethical? An Analysis Under The Code of Professional Responsibility,* 19 Ariz.L.Rev. 863 (1977); Note, *The Mary Carter Agreement—Solving the Problem of Collusive Settlement in Joint Tort Actions,* 47 S.Cal.L.Rev. 1393 (1974); Comment, *Mary Carter Agreements: Unfair and Unnecessary,* 32 Sw.L.J. 779 (1978); Note, *Mary Carter Agreements: A Viable Means of Settlement?,* 14 Tulsa L.J. 744 (1979); Note, *"Mary Carter" Limitation on Liability Agreements Between Adversary Parties: A Painted Lady is Exposed,* 28 U.Miami L.Rev. 988 (1974); Annot., 65 A.L.R.3d 602 (1975).

**4.** One commentator has suggested the term "innovative agreements" in recognition of the fact that such settlement agreements may take a variety of forms. Comment, *Gallagher Cove-*

*nants, Mary Carter Agreements and Loan Receipt Agreements: Unsettling Contribution to Conflict Resolution,* 1977 Ariz.St.L.J. 117.

**5.** In *Groves v. Compton,* 167 W.Va. 873, 280 S.E.2d 708 (1981), we reviewed our law with regard to handling the offset question where the plaintiff makes a monetary settlement with one of several defendants who are joint tortfeasors and stated in Syllabus Point 2:

> ' "In the absence of a written stipulation by the parties, the better rule is to leave the question of the manner of handling the offset occasioned by the settlement by a joint tortfeasor, as well as the manner of informing the jury that such party has been dismissed from the lawsuit, to the sound discretion of the trial court."

It is clear that *Groves* and its predecessors did not involve arrangements like Mary Carter agreements. However, we see no reason why disclosure should not be made when such settlements are made.

against the vendor defendants, may occupy a somewhat analogous position to a plaintiff.[6] More importantly, the settlement paid by the vendor defendants to Air Products is a fixed sum and their liability will not decrease in proportion to any amount that Air Products might recover from the nonagreeing defendants.

The agreement, which is attached as an appendix to this opinion, has three major objectives. First, it settles all claims for indemnity and contribution among the parties to the agreement. Second, it requires Air Products to indemnify the other parties to the agreement against any recovery by the plaintiff or nonsettling defendants. Third, it authorizes Air Products to conduct a joint defense on behalf of the settling defendants.

■ With regard to the release of claims for indemnity and contribution, it is widely recognized that defendants may by an express agreement release and settle inter se their claims for contribution or indemnity prior to a recovery against one or more of them by the plaintiff. *See, e.g., Brown v. Eakin,* 50 Del. 574, 137 A.2d 385 (Super.Ct. 1957); *Norton v. Benjamin,* 220 A.2d 248 (Me.1966); *Tarantola v. Williams,* 48 App. Div.2d 552, 371 N.Y.S.2d 136 (1975); *McNair v. Goodwin,* 262 N.C. 1, 136 S.E.2d 218 (1964); *State v. Campbell,* 602 S.W.2d 874 (Mo.Ct.App.1980); *Claunch v. Bennett,* 395 S.W.2d 719 (Tex.Civ.App.1965); Annot., 34 A.L.R.3d 1374, 1377 (1970). Consequently, we see no problem with this portion of the settlement agreement.

■ The fact that the settlement agreement requires Air Products to indemnify

the settling defendants from any judgment rendered against them in favor of the plaintiffs or the nonsettling defendants does not vitiate the settlement agreement. In *Sellers v. Owens-Illinois Glass Co.,* 156 W.Va. 87, 191 S.E.2d 166 (1972), we dealt with a contract that required the indemnitor to indemnify the indemnitee against his own negligence and held in Syllabus Point 1 that:

"Contracts of indemnity against one's own negligence do not contravene public policy and are valid."

*See also Sydenstricker v. Unipunch,* 169 W.Va. 440, 288 S.E.2d 511, 515 (1982); *Borderland Coal Co. v. Norfolk & Western Ry. Co.,* 87 W.Va. 339, 104 S.E. 624 (1920); *Walton v. Cherokee Colliery Co.,* 70 W.Va. 48, 73 S.E. 63 (1911); 41 Am. Jur.2d *Indemnity* § 9 (1968).[7]

■ The final portion of the settlement agreement requires Air Products to conduct the defense on behalf of the settling defendants whom it has agreed to indemnify. We do not believe that this provision on its face violates our public policy. In the indemnity field, it is recognized that an indemnitor may assume control of the indemnitee's defense, at least where no conflict of interest exists.[8] *See Heritage v. Pioneer Brokerage & Sales, Inc.,* 604 P.2d 1059 (Alaska 1979); *Commercial Standard Ins. Co. v. Cleveland,* 86 Ariz. 288, 345 P.2d 210 (1959); *United Pacific Ins. Co. v. Sunset Cove, Inc.,* 263 Or. 303, 502 P.2d 261 (1972); 42 C.J.S. *Indemnity* § 38 at 632 (1944). In most

---

6. We do not have before us the pleadings in the underlying action. It would appear that with the plaintiff filing against all defendants, Air Products has cross-claimed the vendor defendants.

7. I would like to insert a new footnote at the end of this string citation as follows: No issue is raised as to the applicability of W.Va.Code, 55–8–14 (1975).

8. No issue is raised as to whether ethical considerations foreclose the same attorneys from representing both Air Products and the settling defendants. *See Commercial Standard Ins. Co. v. Cleveland,* 86 Ariz. 288, 345 P.2d 210 (1959); *United Pacific Ins. Co. v. Sunset Cove, Inc.,* 263 Or. 303, 502 P.2d 261 (1972); Moore, *Conflicts*

*of Interest in the Simultaneous Representation of Multiple Clients: A Proposed Solution to the Current Confusion and Controversy,* 61 Tex.L.Rev. 211 (1982).

Furthermore, it is debatable whether I.V.S. or Mobay would have standing as third parties to raise an ethical representation issue. *See* Greene, *Everybody's Doing It—But Who Should Be? Standing to Make a Disqualification Motion Based on an Attorney's Representation of a Client with Interests Adverse to those of a Former Client,* 6 U. Puget Sound L.Rev. 205 (1983); *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1479–80 nn. 51 and 53 (1981); 7 Am.Jur.2d *Attorneys at Law* § 184 at 234 (1980); 7 C.J.S. *Attorney and Client* § 157 at 224 (1980).

cases, if an indemnitor does not assume control of the indemnitee's defense, he will be held liable for the attorney fees and costs incurred by the indemnitee in the defense of the original action. *Frommeyer v. L & R Constr. Co.*, 261 F.2d 879, 881 (3d Cir.1958); *Southern Ariz. York Refrigeration Co. v. Bush Manuf. Co.*, 331 F.2d 1, 6 (9th Cir.1964); *Moore v. Chesapeake & O. Ry. Co.*, 493 F.Supp. 1252, 1270 (S.D.W. Va.1980), *aff'd*, 649 F.2d 1004 (4th Cir. 1981); *White v. Calif. Co.*, 260 F.Supp. 586, 589 (W.D.La.1965), *aff'd per curiam sub nom. Bogle v. Calif. Co.*, 369 F.2d 699 (5th Cir.1966); *Commercial Ins. Co. v. Cleveland*, 86 Ariz. 288, 296, 345 P.2d 210, 216 (1959); *Jennings v. Ralston Purina Co.*, 201 So.2d 168, 175 (La.Ct.App.1967); *Hartford Acc. & Indem. Co. v. Dahl*, 202 Minn. 410, 413–14, 278 N.W. 591, 593 (1938); *St. Paul Fire & Marine Ins. Co. v. Crosetti Bros., Inc.*, 256 Or. 576, 580, 475 P.2d 69, 71 (1970); *Harpeth Valley Util. Dist. v. Due*, 225 Tenn. 181, 185, 465 S.W.2d 353, 354–55 (1971); Annot., 77 A.L.R.2d 1143 (1961); 9B Michie's Jurisprudence of Virginia and West Virginia, *Indemnity* § 8 at 421 (1984); 41 Am.Jur.2d *Indemnity* § 36 (1968).

■ Therefore, we conclude that a contract of settlement among defendants, which settles their claims for indemnity and contribution inter se and provides that the defendant who receives the settlement proceeds shall indemnify and defend the settling defendants against any monetary recovery by the plaintiff or by the nonsettling defendants, is not, for these features alone, invalid as being contrary to our public policy.

■ Mobay and I.V.S. contend, as a final point, that the settlement has undermined the adversarial process and thereby impaired their right to a fair trial. This claim rests generally on an assertion that Air Products, by settling with the vendor defendants, diminishes the ability of I.V.S. and Mobay to develop issues. We are cited one example.

In November, 1981, Air Products filed supplemental answers to certain interrogatories promulgated by one of the vendor defendants, Chicago Bridge & Iron Company.[9] According to these supplemental answers, Air Products intended to call two expert witnesses at trial for the purpose of identifying various design and equipment defects in the nitrogen tank that overpressurized. Shortly after the settlement agreement was finalized, these experts stated during deposition hearings that they did not hold the opinions attributed to them in the answers.

Of some significance in this area is the fact that the plaintiffs have not taken the position that the settlement has damaged their case. We also stress that none of the settling vendor defendants have been dismissed from the case, and cannot be, because there has been no settlement between them and the plaintiff. Discovery is available to Mobay and I.V.S. against the settling vendor defendants because they are still parties.

The essence of the Mobay and I.V.S. argument is that Air Products has manipulated its experts in order to protect the vendor defendants that have settled. There can be little question that both experts could be and were cross-examined during their depositions with regard to any discrepancy between their opinions and the earlier interrogatory answers. In *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666, 682 (1979), we recognized the role that experts play in product liability cases and implicit in our discussion was the possibility of conflicting views on the part of experts. We decline to hold the settlement agreement void because of a shift in the opinion of Air Products' experts.

We hold that the settlement agreement was not contrary to our public policy and, therefore, that the circuit court exceeded its lawful powers in setting it aside. We

**9.** We noted in Syllabus Point 3 of *Prager v. Meckling*, 172 W.Va. 785, 310 S.E.2d 852 (1983): "Rule 26(e)(2) of the Rules of Civil Procedure imposes a continuing obligation to supplement responses previously made when, in light of subsequent information, the original response is incorrect." We also held in Syllabus Point 4 of *Prager* that the failure to supplement previous responses can result in the imposition of sanctions.

do not, however, foreclose the circuit court from determining whether the agreement may be utilized in discovery or trial.[10]

Writ as Moulded Awarded.

## APPENDIX

### EXHIBIT NO. A

### MUTUAL SETTLEMENT AND RELEASE AGREEMENT

THIS AGREEMENT is entered into this 15th day of January , 1982, between and among the following parties:

Air Products & Chemicals, Inc., (hereinafter "APCI"); and

Chicago Bridge & Iron Company, (hereinafter "CBI"); and

Graver Tank & Manufacturing Company,

Graver Tank & Manufacturing Company—Northeast Region,

Aerojet-General Corporation,

General Tire & Rubber Company,

Trans-Union Corporation,

Union Tank Car Company,

Graver Energy Systems, Inc., (hereinafter jointly "Graver"); and

American Chain & Cable Company,

ACCO Industries, Inc., (hereinafter jointly "ACCO"); and

Shand & Jurs Manufacturing Company,

G.P.E. Controls, Inc.,

General Precision Equipment Corporation,

The Singer Company,

Vapor Corporation (hereinafter jointly "Vapor");

in order to mutually settle and release any and all of the actions, suits and claims which exist among them, including claims among them which have resulted from suits filed by others, arising out of the rupture of a cryogenic storage tank and the events immediately following this rupture on January 31, 1978, at the APCI and Mobay Chemical Corporation plants at New Martinsville, West Virginia (hereinafter "the New Martinsville incident"). It is understood and agreed between the parties to this Agreement that it is entered into solely to amicably resolve and settle disputes existing among the parties and is in no way to be considered an admission of liability or fault by any party hereto.

NOW THEREFORE, in consideration of the foregoing and the mutual agreements and representations contained herein, each

---

**10.** Although Mobay and I.V.S. do not argue the point here, in the circuit court they requested the right to renew the deposition of Air Products' experts in order to cross-examine them regarding the settlement agreement. We recognize that there is authority permitting cross-examination regarding a completed settlement agreement for purposes of proving bias or prejudice of a witness. *McShain, Inc. v. Cessna Aircraft,* 563 F.2d 632 (3d Cir.1977) (per curiam); *Reichenbach v. Smith,* 528 F.2d 1072 (5th Cir.1972); *Zelayeta v. Pacific Greyhound Lines,* 104 Cal.App.2d 716, 232 P.2d 572 (1951); *Luis v. Cavin,* 88 Cal.App.2d 107, 198 P.2d 563 (1948); *Hayes v. Coleman,* 338 Mich. 371, 61 N.W.2d 634 (1953); *Dornberg v. St. Paul City Ry. Co.,* 253 Minn. 52, 91 N.W.2d 178 (1958); *Joice v. Missouri-Kansas-Texas Ry. Co.,* 354 Mo. 439, 189 S.W.2d 568 (1945); *Pfiffner v. Kroger Grocer & Baking Co.,* 140 S.W.2d 79 (Mo.Ct.App.1940); *Rynar v. Lincoln Transit Co.,* 129 N.J.L. 525, 30 A.2d 406 (1945); *Miller v. I.P. Thomas & Son Co.,* 89 N.J.L. 364, 98 A. 193 (1916) (per curiam); *Etheridge v. Gordon Constr. Co.,* 62 Wash. 256, 113 P. 639 (1911); Annot., 161 A.L.R. 395 (1946); C. McCormick, The Law of Evidence § 274 at 665 (2d ed. 1972); Fed.R.Evid. 408. Compromise agreements, of course, are not admissible to establish liability on the part of the compromisor. C. McCormick, *supra,* § 274 at 664; 31A C.J.S. *Evidence* § 292 at 747 (1964); Fed.R.Evid. 408.

In the Mary Carter area, it is commonly held that the jury should be informed of the general nature of the compromise agreement so that they will know how the parties' loyalties may be affected by it. *Sequoia Mfg. Co., Inc. v. Hales Constr. Co.,* 117 Ariz. 11, 570 P.2d 782 (1977); *Firestone Tire & Rubber Co. v. Little,* 276 Ark. 511, 639 S.W.2d 726 (1982); *Ward v. Ochoa,* 284 So.2d 385 (Fla.1973); *G.M. Corp. v. LaHocki,* 286 Md. 714, 410 A.2d 1039 (1980); *L.J. Vontz Constr. Co. v. Alliance Indus.,* 215 Neb. 268, 338 N.W.2d 60 (1983); *Bedford School Dist. v. Caron Constr. Co.,* 116 N.H. 800, 367 A.2d 1051 (1976); *Cox v. Kelsey-Hayes Co.,* 594 P.2d 354 (Okla.1979); *Grillo v. Burke's Paint Co., Inc.,* 275 Or. 421, 551 P.2d 449 (1976); *G.M. Corp. v. Simmons,* 558 S.W.2d 855 (Tex.1977); *see Degen v. Bayman,* 86 S.D. 598, 200 N.W.2d 134 (1972). The underlying concern is to ensure a fair trial. These decisions follow the general rule that evidence of a settlement agreement is not admissible to establish liability. *See, e.g., Bedford School Dist.,* 116 N.H. at 805, 367 A.2d at 1055; *Reese v. Chicago, Burlington & Quincy R.R. Co.,* 55 Ill.2d 356, 365, 303 N.E.2d 382, 387 (1973).

of the parties hereto covenants and agrees as follows, intending to be legally bound:

1. Each party hereto settles, releases and discharges and agrees to withdraw, discontinue and dismiss with prejudice, as far as may be possible under the applicable rules of civil procedure, any and all of the actions, suits and claims which it has filed or made, or could have filed or made, against any other party to this Agreement arising out of the New Martinsville incident.

2. CBI, Graver, ACCO and Vapor agree collectively to pay to APCI the sum of one dollar ($1.00) and other good and valuable consideration. APCI acknowledges that this sum and other good and valuable consideration have been paid.

3. APCI agrees to indemnify, hold harmless from loss, damage or liability, and from and after the date of this Agreement defend, CBI, Graver, ACCO and Vapor, their officers, directors, employees, predecessors, successors, insurors and assigns, for, from and against the following: any and all actions, suits, claims, cross-claims, counterclaims, and any other liability whatsoever, including related defense costs, attorneys fees, expenses and interest, which anyone, including but not limited to any of the following persons or entities has filed or made, or could have filed or made, arising out of personal injury, death, property damage, or business interruption directly resulting from the New Martinsville incident:

Air Products & Chemicals, Inc.;

Mobay Chemical Corporation, (hereinafter "Mobay");

Industrial Valve Service; I.V.S. Hydro, Inc.; I.V.S. Inc.;

Baltimore and Ohio Railroad Company;

Marjorie H. Luster, as Executrix of the Estate of James H. Luster;

Dorothy A. Weber, as Administratrix of the Estate of Michael Weber;

Donna W. Henry, as Executrix of the Last Will and Testament of Joseph A. Henry;

Mary Sue Rodriguez, as Administratrix of the Estate of Benjamin F. Rodriguez; and;

Ralph James Barrows, as Administrator of the Estate of Robert Barrows.

except for any defense costs, including attorney's fees expenses or interest, which have heretofore been incurred by CBI, Graver, ACCO and Vapor.

4. CBI, Graver, ACCO and Vapor agree to accept the counsel selected by APCI and otherwise cooperate with APCI in defending against any actions, claims or suits arising out of the New Martinsville incident and at APCI's request and expense shall attend depositions, hearings, and trials and shall make available and assist in securing, files, documents, and evidence, as well as the attendance and testimony of witnesses who are their employees, and shall exercise reasonable efforts to make available any expert and other non-employee witnesses previously retained by them in connection with the New Martinsville incident.

5. CBI, Graver, ACCO and Vapor agree to continue, at their own expense and through their present counsel of record, to oppose, until initial disposition (including rehearing, if any) by the trial court, the Motion of Defendant Mobay for Leave to File Cross-claims against the Third Party Defendants recently filed by Mobay in the action in the United States District Court for the Southern District of Ohio, Eastern Division, Case No. C–2–79–L69. However, it is understood and agreed that if CBI, Graver, ACCO and Vapor are unsuccessful in their opposition to Mobay's Motion, APCI will indemnify, hold harmless from loss, damage or liability, and defend CBI, Graver, ACCO and Vapor as set forth in paragraph 3 above.

6. CBI, Graver, ACCO and Vapor agree to withdraw forthwith any and all Motions or discovery notices, requests or other matters not heretofore withdrawn directed to APCI in all of the actions and suits now pending arising out of the New Martinsville incident.

7. It is understood and agreed between the parties to this Agreement that this is a complete Mutual Settlement and Release Agreement and that there are no written or

oral understandings or agreements directly or indirectly connected with this agreement that are not incorporated herein.

8. The parties to this Agreement hereby declare that they fully understand the terms of this Agreement and that the Agreement has been voluntarily accepted for the purpose of making a full and final settlement and release of the various claims presently existing between the parties.

9. The parties understand and agree that six originals of this Agreement have been executed and that any signed original is as effective as if it were the only original.

10. The terms of this Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania. It is the intention of the parties hereto that this Agreement shall be valid and enforceable under any applicable law.

11. The agreement to indemnify, hold harmless from loss, damage or liability and defend herein provided for will extend from the date of this Agreement until all actions, suits or claims arising out of the New Martinsville incident have been terminated with prejudice.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have caused this Agreement to be executed.

779

ATTEST:                          AIR PRODUCTS & CHEMICALS, INC.

*Richard H. Albert*            BY *William J Schrock*

ATTEST:                          CHICAGO BRIDGE & IRON COMPANY

_____          BY_____

ATTEST:                          GRAVER TANK & MANUFACTURING COMPANY
                                 GRAVER TANK & MANUFACTURING COMPANY-
                                     NORTHEAST REGION
                                 AEROJET-GENERAL CORPORATION,
                                 GENERAL TIRE & RUBBER COMPANY,
                                 TRANS-UNION CORPORATION,
                                 UNION TANK CAR COMPANY,
                                 GRAVER ENERGY SYSTEMS, INC.

_____          BY *David F. Adams, Attorney*

ATTEST:                          AMERICAN CHAIN & CABLE COMPANY,
                                 ACCO INDUSTRIES, INC.

_____          BY_____

ATTEST:                          SHAND & JURS MANUFACTURING COMPANY,
                                 G.P.E. CONTROLS, INC.,
                                 GENERAL PRECISION EQUIPMENT
                                     CORPORATION
                                 VAPOR CORPORATION

_____          BY_____

ATTEST:                          THE SINGER COMPANY

_____          BY_____