387 S.E.2d 302

**David J. MORRIS and**
**M. Hannah Morris**

v.

**Prasada Rao BOPPANA, M.D.**

No. 18693.

Supreme Court of Appeals of
West Virginia.

Nov. 16, 1989.

H. Truman Chafin and Gretchen O. Lewis, Williamson, for David J. Morris and M. Hannah Morris.

Michael J. Farrell, Huntington, for Prasada Rao Boppana, M.D.

BROTHERTON, Chief Justice:

David J. Morris broke his left leg while playing touch football on February 13, 1984. On the following day, Morris was admitted to Logan General Hospital, where he was treated by R. J. Khanna, M.D. Dr. Prasada Rao Boppana was first consulted on a specific matter relating to Morris' treatment on February 22, 1984. Dr. Khanna performed three surgeries on Morris, the final surgery resulting in the amputation of Morris' left leg on March 3, 1984.

On December 7, 1984, Morris and his wife filed suit against Dr. Khanna and Logan Medical Foundation, claiming they sustained damages as a proximate and direct result of the negligence and medical malpractice of both defendants. The plaintiffs filed an amended complaint on February 20, 1986, which added Dr. Rao Boppana as a party to the action.

Dr. Khanna and Logan Medical Foundation settled with Morris for $225,000 prior to trial and were dismissed with prejudice to the plaintiffs in an order entered on January 12, 1987. The trial began on July 27, 1987, and was completed on July 31, 1987, when a verdict was rendered in favor of the remaining defendant, Dr. Rao Boppana.

On November 19, 1987, the Circuit Court of Logan County entered an order denying the plaintiffs' motion for judgment notwithstanding the verdict or for a new trial. The plaintiffs now appeal from this ruling and seek a reversal of the judgment below and a new trial. However, we find no reversible error and, consequently, affirm the judgment of the circuit court below.

The plaintiffs' first assignment of error involves the trial judge's disclosure to the jury of the amount of the settlement that the plaintiffs reached with Dr. Khanna and Logan Medical Foundation prior to trial. Specifically, the plaintiffs object to the fact that the defendant's counsel referred to the settlement amount in his opening statement and claimed that the plaintiffs' expert, Dr. Williams, changed his testimony because of the settlement.

In response, the defendants argue that because of the potential for jury confusion over the realignment of the parties that resulted from the settlement agreement, disclosure of the settlement amount was essential to insure Dr. Rao Boppana a fair trial. The defendants state that the settlement agreement entered by and between the plaintiffs and defendants was a variation on the classic "Mary Carter" settlement agreement, as it provided for a $225,000 direct payment to the plaintiff, plus an additional $100,000 escrow payment. The escrow payment would be paid to the plaintiffs in such a fashion as would guarantee them an additional recovery of $100,000, first from any judgment entered against Dr. Rao Boppana, then from the escrow account from the settling defendants. This agreement capped the settling defendants' liability at between $225,000 and $325,000, while permitting them to reduce the amount they would pay by helping to increase the amount Dr. Rao Boppana would pay.

The four elements of the classic "Mary Carter" agreement are as follows:

1. The agreeing defendants must remain in the action in the posture of defendants.
2. The agreement must be kept secret.
3. The agreeing defendants guarantee to the plaintiff a certain monetary recovery regardless of the outcome of the lawsuit.
4. The agreeing defendants' liability is decreased in direct proportion to the increase in the nonagreeing defendants' liability.

*State ex rel. Vapor Corp. v. Narick,* 173 W.Va. 770, 320 S.E.2d 345, 347–48 (1984).

Clearly, all four elements are not present in this case. The two settling defendants did not remain in the action in the posture of defendants so that a judgment could be rendered against them, nor was the agree-

ment kept secret. However, on this point the defendants contend that it is more important to note that the complete nature of the agreement was kept secret from the jury, as the trial court prohibited the defendants from either introducing the settlement agreement as an exhibit or discussing the contingent nature of the $100,000 escrow account. As a result, the jury did not have an opportunity to consider what effect the $100,000 sliding scale payment might have on the testimony of any of the settling parties or on the plaintiffs' other witnesses. The defendants point out that the third and fourth criteria of the classic "Mary Carter" agreement are met, as the agreeing defendants guaranteed the plaintiffs a certain monetary recovery, regardless of the outcome of the lawsuit against Dr. Rao Boppana, and the agreeing defendants' liability would be decreased in direct proportion to the increase in the nonagreeing defendant's liability. Nevertheless, we cannot conclude that the settlement agreement in this case was, in fact, a "Mary Carter" agreement.

The defendants suggest that this case presents the classic problem of a change of testimony based on party realignment resulting from an innovative settlement agreement. It is the defendant's position that the evidence presented at trial clearly showed that the plaintiffs' expert, Dr. Williams, significantly changed his testimony after being instructed to change his focus following the settlement agreement.

Citing *State ex rel. Vapor Corp. v. Narick,* 173 W.Va. 770, 320 S.E.2d 345 (1984), the defendants note this Court's discussion of the effect that innovative settlement agreements can have on a jury.

> Disclosure [of innovative agreements] is required because such settlements frequently tend to realign the loyalties of the parties and change their trial tactics from what normally would be expected. It is critical to the fair conduct of the trial to disclose the settlement terms so that the court, with the assistance of counsel, may decide whether the agreement is valid, and if so, what measures should be taken to ensure that the non-

settling party or parties will not be prejudiced.

*Id.* 173 W.Va. 773, 320 S.E.2d at 348. Although the settlement agreement reached in this case was not the classic "Mary Carter" agreement discussed in *Vapor Corp.,* we have previously recognized that the trial court is vested with the discretion to ascertain whether a jury should be informed about any type of settlement. In syllabus point 2 of *Groves v. Compton,* 167 W.Va. 873, 280 S.E.2d 708 (1981), we stated:

> In the absence of a written stipulation by the parties, the better rule is to leave the question of the manner of handling the offset occasioned by the settlement by a joint tortfeasor, as well as the manner of informing the jury that such party has been dismissed from the lawsuit, to the *sound discretion of the trial court.* (Emphasis added.)

We conclude that in this case the trial court did not err in informing the jury of the plaintiffs' $225,000 settlement with Dr. Khanna and Logan Medical Foundation prior to trial. Furthermore, we find no evidence to support the plaintiffs' rather broad assertion that the trial court erred when it "allow[ed] defense counsel to take unfair advantage of the settlement beginning with opening argument and throughout the trial."

■ The plaintiffs next argue that the court erred in sustaining an objection to the testimony of Dr. Richard T. Williams, the plaintiffs' medical expert, with respect to the duty of a consultant doctor. At trial, the evidentiary deposition of Dr. Williams was read to the jury, with the exception of a question and answer which was objected to and sustained. The question which was objected to was, in part: "... [d]oes he have a duty to treat the patient for whatever he sees at the time?" Defense attorneys objected on grounds that this question called for a legal conclusion. According to the defendants' brief, there was an extensive discussion in chambers regarding the propriety of this question and answer. The defendant's basic problem with the question was that although counsel for the plaintiffs claimed to

use the term "duty" relating to a medical duty, he did not say "medical duty" or "standard of care," but simply used the term "duty," and thus the impression the question and answer made on the jury was that the expert was testifying to the doctor's legal duty.

The defendant argues that the plaintiffs' question failed to distinguish between a legal and a medical duty, did not tie the "duty" supposedly owed to the "standard of care" required by West Virginia law, and was inconsistent with the scope of the consultation as shown by the record and, therefore, Judge Grubb did not abuse his discretion in sustaining the objection. However, the plaintiffs counter by stating that the question related to the defendant's professional duty of care and, as such, was the proper subject of expert testimony.

We find the plaintiffs' argument on this point meritless. Under W.Va.R.Evid. 702, a trial court has broad discretion to decide whether to admit expert testimony and, if the court finds that such evidence is unnecessary, cumulative, confusing, or misleading, the court may then refuse to admit it. Syl. pt. 4, *Rozas v. Rozas*, 176 W.Va. 235, 342 S.E.2d 201 (1986). Furthermore, it appears from the record that this issue was discussed at other points in the proceedings and the trial judge considered this fact when he decided to sustain this particular objection.

■ In the third and final assignment of error, the plaintiffs argue that the court erred in striking the testimony of their vocational rehabilitation expert and instructing the jury to disregard certain portions of his testimony with respect to the lost future earning capacity of the plaintiff.

In his opening statement, the plaintiffs' counsel indicated that the plaintiffs would call two expert witnesses to testify on the issue of Morris' lost future earning capacity:[1]

We'll also bring to you, in an effort to bring to you the very best evidence I could for you to make up your mind when it comes down to the time for the verdict, *two other experts; one called a vocational occupational expert* from W.V.U. in Morgantown. *His name is Sandy Serpento* and he can tell you from a very educated point of view what this man can and can not do by the way of work.

... and *the other expert is Dan Selby. He's an economist.* He'll testify to you on numbers and figures and tell you in terms of dollars just for the rest of his lifetime, between now and 62 when a normal person retires, what he will lose in the salary. (Emphasis added.)

On July 29, 1987, the plaintiffs' vocational rehabilitation expert, Sandy Serpento, testified that he calculated Mr. Morris' lost future earning capacity as a result of the disability at $387,000. Counsel then asked Serpento a final question on direct examination:

Q. Now that figure [$387,000] is not reduced to present value; is it Sandy?

A. No, its a constant figure. Doesn't even account for wage increases. The constant amount of—you're saying what someone would earn a constant figure of $15,496.00 for the next 25 years. No salary increases. That's in somebody else's field, not me to figure that up.

Serpento was then cross-examined by defense counsel, after which he was excused. The plaintiffs rested their case-in-chief following Serpento's testimony.

The defense then made a motion for a directed verdict and also moved to strike Serpento's testimony regarding the lost future earning capacity because the figures presented were not reduced to present val-

---

1. "If specific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." W.Va.R.Evid. 702; *see Ventura v. Winegardner,* 178 W.Va. 82, 357 S.E.2d 764 (1987), in which we held that a vocational counselor was not qualified as an expert to testify on the subject of what a player's future earnings would have been as a tennis professional.

ue.[2] The defense argued that the plaintiffs had a duty to call their economic expert, Dan Selby, a certified public accountant, whom plaintiffs subpoenaed and who was present in the courtroom before plaintiffs rested their case. The plaintiffs state that because the defense made no objection to Serpento's testimony, they decided not to present the further testimony of Dan Selby and instead rested their case.

The plaintiffs argue that this Court should consider whether the plaintiffs had an affirmative duty to present expert evidence of lost future earnings reduced to present value or whether the defendant bears the burden of establishing that the present value of such lost future income is not the same as plaintiffs' projected lost future earnings.

We need not decide this issue and do not attempt to do so in this case. Quite simply, we fail to see why the figure offered by the plaintiffs' expert needed to be reduced to its so-called present value, in light of the fact that this amount did not take either inflation or wage increases into consideration. While it is true that the plaintiffs originally indicated that they would call Dan Selby to testify, both parties to this case were given ample opportunity to put on Mr. Selby's present value testimony. However, neither party did so, and the trial court ultimately decided to strike that part of Serpento's testimony in which he stated that the plaintiff's future earning capacity was impaired in the amount of $387,000.

Although the plaintiffs now argue that the trial court erred in striking this testimony, we find that any such error was rendered harmless when the jury did not find Dr. Rao Boppana liable for any degree of negligence in his treatment of the plaintiff. The verdict forms used by the jury in this case contained spaces in which the jury could indicate, on Jury Verdict No. A: (1) the percentage of fault individually attributable to Dr. Khanna, Dr. Rao Boppana, and Logan General Hospital and (2) the amount of damages the jury wished to award to each plaintiff. On the form labelled Jury Verdict No. B, the jury could indicate its verdict "for Dr. Rao [Boppana] and against the plaintiffs." The jury returned Jury Verdict No. B.

Although we do not have the benefit of the court's instructions, we can only presume that the jury was informed as to how the verdict forms should be utilized. Jury Verdict No. B is obviously a defense verdict form. The plaintiffs have not argued that there was any error with regard to the forms themselves or the instructions surrounding them. Because the jury did not find any liability on the part of Dr. Rao Boppana, the fact that there was no testimony on damages for the jury to consider is irrelevant. In *Prager v. Meckling*, 172 W.Va. 785, 310 S.E.2d 852, 857 (1983), we recognized that "where the plaintiff does not prevail as to liability any errors he claims as to damage instructions are harmless because, without a verdict on the liability issue, he is not entitled to any damages." This principle should apply not only to damage instructions, but to all issues related to damages, when the party asserting error did not prevail on the issue of liability.

Having reviewed the errors assigned by the plaintiffs, we find no reversible error and affirm the judgment entered by the trial court below.

Affirmed.

**2.** The rationale behind the reduction of damages to present value may be explained as follows:

> The current practice in personal injury litigation is to award plaintiffs a present sum of money as compensation for future after-tax lost earnings. The intention is to make the plaintiff "whole" in the sense that the present value award allows the plaintiff, through investment in relatively safe securities, to replicate over time the lost earnings stream. The amount of such an award therefore depends on the rate of growth expected in after-tax earnings in the plaintiff's pre-injury occupation and the after-tax rate of interest the plaintiff is expected to earn through investing the award.

Anderson and Roberts, *Misconceptions in Discounting Lost Earnings to Present Value: Rejoinder and Clarification of Fulmer–Geraghty, Lewis and Ledford–Zocco*, 37 Fed.Ins.Coun.Q. 21, 22 (1986).