542 S.E.2d 443

**STATE of West Virginia, Plaintiff
Below, Appellee,**

v.

**Carl E. LOCKHART, Defendant
Below, Appellant.**

No. 27053.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 6, 2000.

Decided Dec. 1, 2000.

624

Lee F. Benford, II, Ravenswood, West Virginia, Attorney for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, Charleston, West Virginia, Attorneys for the Appellee.

DAVIS, Justice:

Carl E. Lockhart appeals his convictions for the offenses of sexual assault in the first degree, battery, burglary, and assault during the commission of a felony. Mr. Lockhart argues that the trial court erred in excluding testimony, offered by an expert witness in support of an insanity defense, that Mr. Lockhart suffered from Dissociative Identity Disorder. We find that expert testimony regarding Dissociative Identity Disorder *may* be admissible in connection with a defendant's assertion of an insanity defense. However, the admissibility of specific expert testimony regarding Dissociative Identity Disorder must be evaluated on a case-by-case basis. In the instant case, we conclude that the trial court did not err in excluding the expert testimony.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Following a jury trial that commenced on November 6, 1995, Carl E. Lockhart, appellant and defendant below (hereinafter referred to as "Mr. Lockhart"), was convicted of the offenses of sexual assault in the first degree, battery, burglary, and assault during the commission of a felony. On a previous appeal of his conviction to this Court, Mr. Lockhart argued, in relevant part, that the Circuit Court of Wood County erred by refusing to permit him to present an insanity defense based upon the theory that he suffered from a mental impairment known as "Dissociative Identity Disorder" (also known as "Multiple Personality Disorder").[1] *See*

---

1. In describing the diagnostic features of DID, the American Psychiatric Association has stated: The essential feature of Dissociative Identity Disorder is the presence of two or more distinct identities or personality states (Criterion A) that recurrently take control of behavior (Criterion B). There is an inability to recall important personal information, the extent of

*State v. Lockhart,* 200 W.Va. 479, 490 S.E.2d 298 (1997) (hereinafter referred to as *"Lockhart I"*).[2] In a per curiam opinion rendered by this Court in *Lockhart I,* we observed that, in addition to refusing to allow Mr. Lockhart's insanity defense, the circuit court "failed to allow counsel for [Mr. Lockhart] to proffer into the record, through the testimony of his principal witness, [Dr. Harry J. Coffey, Ph.D., a psychologist,] evidence concerning the nature of Dissociative Identity Disorder and the relevance of that disorder to [Mr. Lockhart]." 200 W.Va. at 481, 490 S.E.2d at 300. Instead, the circuit court had permitted Mr. Lockhart's counsel to "state for the record a profile or summary of Dr. Coffey's testimony." *Id.* at 483, 490 S.E.2d at 302. Due to the absence of a proffer from Mr. Lockhart's principal expert witness, the *Lockhart I* Court concluded that the record on appeal was wholly inadequate from which to determine whether Mr. Lockhart's "rather novel theory of insanity," based upon Dissociative Identity Disorder, should have been presented to the jury. *Id.* at 484, 490 S.E.2d at 303. Consequently, the Court remanded the case "to the circuit court to enable counsel for [Mr. Lockhart] to make a complete evidentiary proffer of Dr. Coffey's evidence concerning Dissociative Identity Disorder and its relevance to [Mr. Lockhart]." *Id.* at 485, 490 S.E.2d at 304. The Court went on to explain:

> If, upon completion of the proffer, the circuit court is of the opinion that the appellant's insanity defense should not be presented to a jury, the circuit court shall make an appropriate disposition of the appellant in conformity with the above convictions, subject to a discretionary appeal to this Court. If, however, the circuit court is of the opinion that it committed error in not allowing such a defense to be presented, the circuit court shall award the appellant a new trial. *See State v. Richards,* 195 W.Va. 544, 466 S.E.2d 395 (1995).

*Id.* In addition, the *Lockhart I* Court cautioned that "[t]he proffer of Dr. Coffey's specific testimony concerning Dissociative Identity Disorder, and its relevance to the appellant ... must be of sufficient quality and quantity to enable the circuit court, and this Court, to rule intelligently upon the issue." *Id.* (citations omitted).

On October 29, 1998, the circuit court conducted a hearing at which it received the proffered testimony of Dr. Coffey. Following this hearing, the circuit court again determined that Mr. Lockhart should not be permitted to present his proposed insanity defense to the jury. The circuit court commented:

> There was never even an attempt to show that[ Mr. Lockhart] didn't have the ability to conduct his action, to conform his conduct to the requirements of the law. There is no attempt, anywhere.
>
> The only thing that it was based upon, this defense, is that he didn't appreciate the wrongfulness of his actions, and there is no evidence of that in this case. All we have if it is even that, is a diagnosis of DID. It just doesn't even come close to meeting the standard for an insanity defense, not even close.
>
> . . . .
>
> It makes no sense to say, or to hold in any case that I can conceive of, that DID is a defense to a criminal act. It makes no sense. It would be contrary to all logic, and I would urge our court to not venture into that quagmire.

The circuit court then rendered an order, which was entered on December 17, 1998, making the following findings:

> 1. Dr. Coffey does not assert that the criminal acts for which the defendant has been convicted were the result of a mental disease or defect which caused the accused to lack the capacity to appreciate the

---

which is too great to be explained by ordinary forgetfulness (Criterion C). The disturbance is not due to the direct physiological effects of a substance or a general medical condition (Criterion D).
American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorder* 484 (4th ed.1994).

**2.** Due to the nature of the present appeal, a detailed discussion of the facts that lead to Mr. Lockhart's convictions underlying this appeal is not required. For such a discussion, see *Lockhart I.*

wrongfulness of his actions, or to conform his behavior to the requirements of the law.

2. To permit the defendant to offer a defense of insanity based upon Dissociative Identity Disorder would raise immaterial and irrelevant issues which would cloud the real issues.

3. The defendant's proposed insanity defense should not be presented to a jury.

Finally, the circuit court remanded Mr. Lockhart to the custody of the Department of Corrections to complete the sentences it had previously imposed for his various convictions.[3] It is from the December 17, 1998, order of the Circuit Court of Wood County that Mr. Lockhart now appeals.

## II.

### STANDARD OF REVIEW

■■■ There are two basic issues to be addressed in this case. One, whether West Virginia recognizes Dissociative Identity Disorder as a basis for an insanity defense, and, two, whether Dr. Coffey should have been permitted to testify regarding this condition in Mr. Lockhart's trial. The question of whether West Virginia recognizes Dissociative Identity Disorder as a basis for an insanity defense presents a question of law which is reviewed *de novo* by this Court. *See* Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). The circuit court's decision whether to allow expert witness testimony during a trial is reviewed for an abuse of discretion:

"The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless

it is clearly wrong." Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991), *cert. denied*, 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991).

Syl. pt. 1, *West Virginia Div. of Highways v. Butler*, 205 W.Va. 146, 516 S.E.2d 769 (1999). *See also* Syl. pt. 2, *Morris v. Boppana*, 182 W.Va. 248, 387 S.E.2d 302 (1989) (" 'Under W. Va. R. Evid. 702, a trial judge has broad discretion to decide whether expert testimony should be admitted, and where the evidence is unnecessary, cumulative, confusing or misleading the trial judge may properly refuse to admit it.' Syllabus point 4, *Rozas v. Rozas*, 176 W.Va. 235, 342 S.E.2d 201 (1986)."). With due consideration for these standards, we now address the issues raised in this appeal.

## III.

### DISCUSSION

Mr. Lockhart lists numerous assignments of error in his brief to this Court; however, he provides an argument only for the general proposition that the trial court erred by refusing to permit him to present an insanity defense based upon Dissociative Identity Disorder. We will address only the issue actually discussed in Mr. Lockhart's brief.[4] To resolve the sole issue properly raised by Mr. Lockhart, we must answer two basic questions. First, whether expert opinion testimony on Dissociative Identity Disorder is generally admissible in West Virginia as a basis for an insanity defense, and, second, whether Dr. Coffey should have been permitted to offer his expert opinion regarding this condition in Mr. Lockhart's trial. We address each of these questions in turn.

---

**3.** After a separate recidivist proceeding wherein a jury determined that Mr. Lockhart had twice previously been convicted of felony offenses (abduction, and sexual assault in the second degree), he was sentenced to the following terms of incarceration: fifteen to thirty-five years for his conviction of sexual assault in the first degree, one year for his conviction of battery, life imprisonment for his conviction of burglary, and two to ten years for his conviction of assault during the commission of a felony.

**4.** Assignments of error that are not briefed are deemed waived. *See Poling v. Belington Bank,*

*Inc.*, 207 W.Va. 145, 153 n. 7, 529 S.E.2d 856, 864 n. 7 (1999) (acknowledging that " '[a]ssignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.' " (quoting Syl. pt. 6, *Addair v. Bryant*, 168 W.Va. 306, 284 S.E.2d 374 (1981))); *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 135, 140 n. 10, 506 S.E.2d 578, 583 n. 10 (1998) ("Issues not raised on appeal or merely mentioned in passing are deemed waived." (citing *Addair v. Bryant* )).

## A. Expert Opinion Testimony on Dissociative Identity Disorder as a Basis for an Insanity Defense

Mr. Lockhart first argues that this Court has not adopted a restrictive position with regard to the evidence that may be introduced on the insanity issue. Therefore, Mr. Lockhart reasons, a Dissociative Identity Disorder (hereinafter referred to as "DID")[5] insanity defense should be permitted when there is ample documentation of the disorder and a link shown between the disorder and a defendant's behavior. Mr. Lockhart contends that the definition of DID contained in The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorder* (4th ed.1994) (hereinafter "DSM–IV"), is sufficient to establish such a link in the instant case.

The State responds that the implications of asserting DID for consideration in the evaluation of criminal responsibility are far from settled. The State asserts that the issue of whether an insanity defense based on DID should be accepted in West Virginia should first be addressed as an issue of foundational relevancy and should be considered on the basis of a record far more developed than the one presented in the instant case. The State argues that the DSM–IV itself cautions against its use to support legal conclusions.

Initially, we must determine the proper analysis for considering the admissibility of DID evidence in connection with the assertion of an insanity defense. In *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), this Court adopted a test, which had been set forth by the Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for determining the admissibility of expert scientific testimony pursuant to Rule 702 of the West Virginia Rules of Evidence.[6] In *Daubert*, the Supreme Court of the United States concluded that "under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480. To aid trial courts in carrying out this "gate keeping" obligation, the *Daubert* Court developed a *non-exclusive* list of factors to be considered by trial courts faced with a question of the admissibility of expert testimony. *See Daubert* at 593, 113 S.Ct. at 2796, 125 L.Ed.2d at 482 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test."). Following the lead of *Daubert*, this Court held in Syllabus point two of *Wilt v. Buracker* that:

In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

191 W.Va. 39, 443 S.E.2d 196. The *Wilt/Daubert* standard, as applied in West Virginia, was further clarified by this Court in syllabus points three, four and six of *Gen-*

---

5. While Dissociative Identity Disorder or DID is frequently referred to as Multiple Personality Disorder or MPD in the cases herein reviewed; for consistency and ease of reference, we will utilize the term Dissociative Identity Disorder or DID in all references to this disorder.

6. Rule 702 of the West Virginia Rules of Evidence, which is identical to the federal rule, states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

*try v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995), wherein we held:

> 3. The first and universal requirement for the admissibility of scientific evidence is that the evidence must be both "reliable" and "relevant." Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied,* [511] U.S. [1129], 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), the reliability requirement is met only by a finding by the trial court under Rule 104(a) of the West Virginia Rules of Evidence that the *scientific* or technical theory which is the basis for the test results is indeed "scientific, technical, or specialized knowledge." The trial court's determination regarding whether the scientific evidence is properly the subject of scientific, technical, or other specialized knowledge is a question of law that we review *de novo.* On the other hand, the relevancy requirement compels the trial judge to determine, under Rule 104(a), that the scientific evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue." W. Va. R. Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement is under an abuse of discretion standard. *State v. Beard,* 194 W.Va. 740, 746, 461 S.E.2d 486, 492 (1995).

> 4. When scientific evidence is proffered, a circuit court in its "gatekeeper" role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied,* [511] U.S. [1129], 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science. Second, the

circuit court must ensure that the scientific testimony is relevant to the task at hand.

> . . . .

> 6. The question of admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied,* [511] U.S. [1129], 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994) only arises if it is first established that the testimony deals with "scientific knowledge." "Scientific" implies a grounding in the methods and procedures of science while "knowledge" connotes more than subjective belief or unsupported speculation. In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. It is the circuit court's responsibility initially to determine whether the expert's proposed testimony amounts to "scientific knowledge" and, in doing so, to analyze not what the experts say, but what basis they have for saying it.

Moreover, it has been recognized that the *Wilt/Daubert* factors are non-exclusive and the analysis is a flexible one. *See Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483–84 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."); *Wilt v. Buracker,* 191 W.Va. at 45, 443 S.E.2d at 202 ("The Supreme Court [in *Daubert* ] outlined the various types of considerations that a trial court must take into account when determining the admissibility of expert testimony under Rule 702, and concluded that the inquiry must be a flexible one . . . ." (footnotes omitted)). Having established the proper analysis for our consideration, we now discuss the relevance and reliability of DID generally, as it relates to an insanity defense. We begin with the relevance of DID.

As *Gentry* instructed, "the relevancy requirement compels the trial judge to determine, under Rule 104(a),[7] that the scientific

---

**7.** Rule 104(a) of the West Virginia Rules of Evidence deals with admissibility generally and states:

(a) *Questions of admissibility generally.—* Preliminary questions concerning the qualification of a person to be a witness, the exis-

tence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

evidence 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' W. Va. R. Evid. 702." Syl. pt. 3, in part, 195 W.Va. 512, 466 S.E.2d 171 (footnote added). Moreover, the Rules of Evidence expressly define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W. Va. R. Evid. 401.

 To determine whether evidence of DID would assist the trier of fact to understand evidence of any fact of consequence or to determine a fact in issue when such evidence is offered in connection with an insanity defense, we must first observe the defendant's burden in raising an insanity defense.

When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law, and it is error for the trial court to give an instruction on the issue of insanity which imposes a different test or which is not governed by the evidence presented in the case.

Syl. pt. 2, *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976), *overruled on other grounds by State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). There is, however, in West Virginia, a presumption of sanity:

"There exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden of proof is on the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense." Syl. pt. 2, *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979).

Syl. pt. 6, *State v. McWilliams*, 177 W.Va. 369, 352 S.E.2d 120 (1986). Our holding in

Syllabus point three of *State v. Daggett*, 167 W.Va. 411, 280 S.E.2d 545 (1981), assists in clarifying the actual burden that is placed upon a defendant offering evidence of his or her insanity to overcome the presumption of sanity:

When an accused is relying upon the defense of insanity at the time of the crime charged, the jury should be instructed (1) that there is a presumption the accused was sane at that time; *(2) that the burden is upon him to show that he was then insane; (3) that if any evidence introduced by him or by the State fairly raises doubt upon the issue of his sanity at that time, the presumption of sanity ceases to exist;* (4) that the State then has the burden to establish the sanity of the accused beyond a reasonable doubt, and, (5) that if the whole proof upon that issue leaves the jury with a reasonable doubt as to the defendant's sanity at that time the jury must accord him the benefit of the doubt and acquit him.

(Emphasis added). Thus, a defendant raising an insanity defense has the burden of presenting evidence fairly raising doubt that, at the time of the commission of the crime, he or she lacked the capacity either to appreciate the wrongfulness of his or her act or to conform his or her act to the requirements of the law.

 DID is a complex mental disorder. Thus, appropriate testimony on the condition would certainly be expected to assist a trier of fact to understand evidence regarding the behavior of a defendant so afflicted, and to determine whether, as a result of DID, a defendant lacked the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law. Consequently, it would appear that, when adequate, DID testimony is relevant when offered in connection with a defendant's assertion of an insanity defense.

We now consider whether evidence of DID is *generally* reliable when asserted in connection with an insanity defense. In conducting

Rule 104(b) states: "(b) *Relevancy conditioned on fact.*—When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

this analysis, we consider whether DID enjoys general acceptance in psychiatric community, and how other courts have treated such evidence. Although, as noted by the State, the DSM–IV includes a cautionary statement regarding its use as a basis for legal judgments, we find it useful in determining the general acceptance of DID.[8] The DSM–IV's "Cautionary Statement," while warning against the manual's use in reaching legal conclusions as to what constitutes mental disease, disorder, or disability, or legal determinations regarding responsibility or competency, nevertheless expressly states that its criteria and classifications of mental disorders "reflect a consensus of current formulations of evolving knowledge in our field." DSM–IV at xxvii.[9] Moreover, we note that the Court of Appeals of Washington, after a comprehensive review of DID literature, concluded that the condition is generally accepted in the scientific community. *State v. Greene*, 92 Wash.App. 80, 960 P.2d 980 (1998), *overruled, in part, on other grounds*, 139 Wash.2d 64, 984 P.2d 1024 (1999).[10] The Supreme Court of Washington affirmed the Court of Appeals' conclusion that DID is generally accepted in the scientific community, but overruled the lower court's determination that the particular DID testimony offered in that case was admissible based upon its conclusion that the evidence of DID was not helpful to the trier of fact as "none of the various approaches [for analyzing DID evidence] have been accepted as producing results capable of reliably helping to resolve questions regarding sanity and/or mental capacity in a legal sense." *State v. Greene*, 139 Wash.2d at 77, 984 P.2d at 1031. *See also Medlock v. State*, 887 P.2d 1333, 1342 n. 12 (Okla.Crim.App.1994) (stating, in dicta, "[b]ecause [DID] is recognized by the American Psychiatric Association as a mental illness, a defendant who suffers from [DID] could use evidence of [DID] to satisfy the mental illness prong of the insanity defense.").

While *State v. Greene* is the only case of which we are aware that has addressed, head on, the issue of the general admissibility of DID evidence, numerous courts have allowed expert testimony on DID as an insanity defense. *See, e.g., United States v. Denny–Shaffer*, 2 F.3d 999 (1993) (reversing trial court based upon its refusal to instruct jury on insanity defense notwithstanding substantial trial testimony that defendant suffered from DID); *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995) (discussing, briefly,

---

**8.** The "Cautionary Statement" contained in the DSM–IV is as follows:

The specified diagnostic criteria for each mental disorder are offered as guidelines for making diagnoses, because it has been demonstrated that the use of such criteria enhances agreement among clinicians and investigators. The proper use of these criteria requires specialized clinical training that provides both a body of knowledge and clinical skills.

These diagnostic criteria and the DSM–IV Classification of mental disorders *reflect a consensus of current formulations of evolving knowledge in our field.* They do not encompass, however, all the conditions for which people may be treated or that may be appropriate topics for research efforts.

The purpose of DSM–IV is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. *It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific consider-*

*ations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency.*

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* xxvii (4th ed.1994).

**9.** *But see* Harrison G. Pope, Jr., M.D. et al., *Attitudes Toward DSM–IV Dissociative Disorders Diagnoses Among Board–Certified American Psychiatrists*, 156 Am. J. Psychiatry 321, 321 (Feb. 1999) (reporting results of a survey sent to a random sample of board-certified psychiatrists). The Pope article reports that only about one-third (thirty-five percent) of the psychiatrists responding to the survey replied that DID should be included in the DSM–IV without reservation. However, an additional forty-three percent of the responding psychiatrists replied that DID should be included with reservations (e.g. as a "proposed diagnosis"). *Id.* at 322.

**10.** The *Greene* Court determined the general acceptance of DID for purposes of an analysis pursuant to *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

testimony of DID presented at trial in support of defendant's insanity defense); *People v. Wade*, 44 Cal.3d 975, 750 P.2d 794, 244 Cal.Rptr. 905 (1988) (describing trial testimony on DID offered to establish defendant's mental state at time of criminal offense); *State v. Bancroft*, 620 So.2d 482 (La.Ct.App. 1993) (relating trial testimony by defense expert who diagnosed DID and opined that the defendant could not have distinguished right from wrong at time of murder); *Commonwealth v. Roman*, 414 Mass. 235, 606 N.E.2d 1333 (1993) (allowing expert to testify regarding his opinion that defendant suffered from DID, and further permitting expert to testify as to the basis for his opinion, i.e., the expert's own interview of the defendant, and his review of her medical and police records, but refusing to allow expert to testify regarding a letter from another physician diagnosing DID); *State v. Jolley*, 508 N.W.2d 770 (Minn.1993) (noting that defendant asserted the defense of mental illness, and further noting that two experts testified on behalf of the defense that defendant suffered from DID); *State v. Bonney*, 329 N.C. 61, 405 S.E.2d 145 (1991) (commenting that clinical psychologist had testified that defendant suffered from DID and could not distinguish right from wrong at the time he committed murder); *State v. Hyde*, 292 N.J.Super. 159, 678 A.2d 717 (1996) (observing that defendant relied on expert testimony that he suffered from DID and obsessive-compulsive disorder to support his defense of mental disease or defect); *People v. Owens*, 203 A.D.2d 916, 611 N.Y.S.2d 67 (1994) (mem.) (reducing conviction from murder in the second degree to manslaughter in the first degree based upon trial testimony showing that the defendant suffered from DID, which established affirmative defense of extreme emotional disturbance); *State v. Grimsley*, 3 Ohio App.3d 265, 268–69, 444 N.E.2d 1071, 1076 (1982) (remarking that uncontroverted expert psychiatric testimony revealed that defendant had been diagnosed with DID, but concluding that evidence was insufficient to establish that the personality controlling defendant's behavior at time of crime was either unconscious or acting involuntarily, or to establish that the defendant's mental condition "had so impaired her reason that she, [as

either personality or as both], either did not know that her [action] was wrong or did not have the ability to refrain from [such action]." (citation omitted)); *State v. Alley*, 776 S.W.2d 506 (Tenn.1989) (relating evidence of DID that was admitted during trial, and finding no error in permitting a social worker to testify regarding the characteristics of DID); *State v. Shickles*, 760 P.2d 291 (Utah 1988) (mentioning that testimony that defendant was believed to be suffering from DID was offered at trial). *See also State v. Rodrigues*, 67 Haw. 70, 679 P.2d 615 (1984) (concluding that trial court erred in granting an acquittal, and stating that issue of insanity, which was based on DID, should have gone to the jury). *But See Kirby v. State*, 201 Ga.App. 116, 118, 410 S.E.2d 333, 335 (1991) (rejecting DID as insanity defense stating " " '[t]here was only one person (committing the criminal act) . . . and only one person accused (of it). It is immaterial whether [he] was in one state of consciousness or another, so long as in the personality then controlling [his] behavior, [he] was conscious and [his] actions were a product of [his] own volition.' " " (citing *Kirkland v. State*, 166 Ga. App. 478, 480, 304 S.E.2d 561, 564 (1983)), and affirming trial court finding of guilty but mentally ill based upon trial testimony regarding DID).

Due to the apparent general acceptance of DID and the numerous courts that have heretofore allowed DID testimony in connection with an asserted insanity defense, we find no reason why expert testimony related to DID should not be admitted in an appropriate case.

Based upon the foregoing, we hold that expert testimony regarding Dissociative Identity Disorder *may* be admissible in connection with a defendant's assertion of an insanity defense. However, the admissibility of specific expert testimony regarding Dissociative Identity Disorder must be evaluated on a case-by-case basis.

Having found *no reason* to wholly reject DID testimony, we now consider whether Dr. Coffey's testimony was admissible in the present case.

### B. Admissibility of Dr. Coffey's Testimony

Mr. Lockhart asserts that Dr. Coffey is a leading authority on Dissociative Disorders and that Dr. Coffey "opined unequivocally that, as a result of the [DID], the defendant [Mr. Lockhart] was not criminally responsible."

The State argues that, even the courts that have found that DID can be the basis for an insanity defense are in agreement that a DID diagnosis, without more, is insufficient. In the instant case, the State asserts, Dr. Coffey opined that Mr. Lockhart is mentally ill merely because he has DID, which is an insufficient foundation to support a DID/insanity defense. Finally, the State argues that there is complete disharmony in the various jurisdictions as to the proper mode of analysis to be used in DID cases.

As we explained above, to determine whether the trial court abused its discretion by excluding Dr. Coffey's testimony we consider the relevance and reliability of the specific evidence proffered [11] as it relates to whether, at the time of the crime, Mr. Lockhart lacked the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law.

It has been suggested that there are at least three possible approaches to analyzing DID to determine whether it resulted in the inability of a defendant to appreciate the wrongfulness of his or her act or to conform his or her act to the requirements of the law: (1) the Alter theory, which requires a determination of which personality committed the offense and an examination of that personality's state of mind at the time of the offense; (2) the Unified theory, which is based upon the premise that, regardless of the number of personalities involved, one body equals one person and it is that one person's mental state that is at issue; and (3) the Host theory, which maintains that if the host was unaware of an alter's actions and had no ability to stop the alter, then the host is not criminally responsible. *See* Sabra McDonald Owens, *The Multiple Personality Disorder (MPD) Defense*, 8 Md. J. Contemp. Legal

Issues 237 (1997). *See also State v. Greene,* 92 Wash.App. 80, 98–102, 960 P.2d 980, 990–91 (identifying four methods of analysis: "(i) the whole-body method, in which DID is essentially ignored; (ii) a rebuttable presumption of insanity for individuals with DID; (iii) the 'global' approach, which examines whether all of the identities were, or at least the host was, aware of the nature and wrongfulness of the conduct; and (iv) the alter test, which asks whether the identity emergent at the time of the crime possessed sufficient mental capacity." (footnotes omitted)), *overruled, in part,* 139 Wash.2d 64, 984 P.2d 1024. While the alter approach may be the most commonly utilized method, all three of these methods, and perhaps others, have been used by various courts. *See* Owens, *supra,* at 248. *See, e.g., United States v. Denny-Shaffer,* 2 F.3d 999 (Host theory); *State v. Grimsley,* 3 Ohio App.3d 265, 444 N.E.2d 1071 (Alter theory); *State v. Halcomb,* 1 Neb.App. 681, 510 N.W.2d 344 (1993) (Unified theory).

Some courts have either declined to use any of these methods or to identify which method was used. *See generally* Owens, *supra.* One court, after a thorough review of DID, concluded that the condition is too complex to fit into a predetermined mode of analysis and should be addressed on a case-by-case basis. *Greene,* 92 Wash.App. 80, 960 P.2d 980. The *Greene* Court explained that:

> the evidence (and common sense) indicates that DID manifests itself somewhat differently in each individual and each situation. Thus, we resist the State's, the defense's, and amici's invitation to adopt one of the methods described above and instead implement a case-by-case approach, which examines whether the symptoms of DID manifested by an individual in a particular situation have relevance with regard to the defenses asserted.

92 Wash.App. at 102, 960 P.2d at 991.

Notwithstanding our admonition in *Lockhart I* that "[t]he proffer of Dr. Coffey's specific testimony concerning [DID], and its relevance to the appellant ... must be of sufficient quality and quantity to enable the

---

**11.** Dr. Coffey's qualifications as an expert were not challenged.

circuit court, and this Court, to rule intelligently upon the issue[.]" 200 W.Va. at 485, 490 S.E.2d at 304, we find Dr. Coffey's testimony to be woefully inadequate to determine which, if any, of the above methods of analysis is appropriate. Due to the inadequacy of the record before us, and the differing opinions among the various jurisdictions regarding which theory to apply in analyzing DID cases, we decline to adopt any specific test in the instant case. Rather, we leave that question for another day. Nevertheless, we find that Dr. Coffey's testimony did not satisfy any of the theories outlined above.

Most notably, Dr. Coffey testified that:

[I]t is, at best, difficult, this removed from the event, to know with any precision the dissociative processes, the switches among ego states, the number of ego states involved, and what their awarenesses and appreciations were at [the time of the crime].

Q. Doctor, I take it that you are unable to tell me, at the precise time of the crime, which of these—assuming that these alter egos exist—you are unable to tell me which one was in control and what he was thinking at that time?

A. *I cannot only not tell you with any degree of psychological certainty which one was in control, I can't even tell you how many took part in the event.*

(Emphasis added). This testimony demonstrates that Dr. Coffey was unable to express an expert opinion regarding Mr. Lockhart's mental state at the time of the crime.

Without an opinion as to which personality or ego state was in control, it is impossible for Mr. Lockhart to prevail under the Alter theory. Similarly, Dr. Coffey offered no testimony that Mr. Lockhart, when viewed as one individual, lacked the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law when committing the offenses with which he was charged. Therefore, there is no evidence supporting a Unified theory. Finally,

as to the Host theory, without knowing which, if any, alternate personality(ies) or ego state(s) was in control at the time of the crime, it is impossible to determine whether Mr. Lockhart's host personality had an awareness of or the ability to control that personality(ies).[12]

█ Basically, Dr. Coffey's opinion constituted little more than a diagnosis that Mr. Lockhart suffered from DID. Such a diagnosis alone, without more, is insufficient to support an insanity defense based on DID. *See Denny–Shaffer,* 2 F.3d at 1016 n. 18 ("We do *not* hold that a factual showing or jury finding that a defendant suffers from [DID], without more, automatically satisfies [the requirements of the insanity defense]"); *Grimsley,* 3 Ohio App.3d at 269, 444 N.E.2d at 1076 ("If we were to allow the bare existence of a defendant's [DID] to excuse criminal behavior, we would also relieve from responsibility for their criminal acts all defendants whose memories are blocked. We do not believe that is the legislative intent of [our culpability statute]."); *Medlock v. State,* 887 P.2d 1333, 1342 n. 12 (Okla.Crim.App.1995) ("[A] mental disability alone is insufficient to establish insanity at the time of the commission of the crime.... Thus, a defendant must prove more than that he is suffering from [DID]. The mental illness must be such that the defendant does not know that his/her acts or omissions are wrong and is unable to distinguish right from wrong with respect to his/her acts or omissions. Or, alternatively, the mental illness must be such that the defendant does not understand the nature and consequences of his/her acts or omissions." (internal citations omitted)); *Greene,* 139 Wash.2d at 73–74, 984 P.2d at 1029 ("In order to be helpful to the trier of fact, ... it is not enough that, based on generally accepted scientific principles, a defendant may be diagnosed as suffering from a particular mental condition. The diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the

12. While Dr. Coffey testified that "[i]t appeared to me, in 1988—it appeared to me, in 1995, that Carl 2 lacked the appreciation, the ability to conform or the desire to conform, and Carl 1 had some appreciation for the wrongfulness, but lacked the power to control Carl 2[,]" this opinion is meaningless in light of Dr. Coffey's inability to express an opinion, to a reasonable degree of psychological certainty, that Carl 2 was in control at the time of the offense.

defendant's mental state at the time of the crime." (citation omitted)).

Finally, we find that Dr. Coffey's testimony was unreliable, and would not have assisted the trier of fact as mandated by Rule 702. Specifically, Dr. Coffey testified that he conducted two examinations of Mr. Lockhart. One in 1988 and another in late 1995 or 1996. Dr. Coffey speculated that the 1988 examination, which was probably split into two separate sessions, had a total duration of four to five hours. The second examination was also split into two separate sessions that lasted about one-and-one-half hours each. During his testimony, which was taken in October, 1998, Dr. Coffey stated that he did not prepare a written report following the second, 1995 or 1996, examination.

Regarding his diagnosis of DID, Dr. Coffey stated that he also conducted a sodium amytal test in 1988, at which time he identified two ego fragments, and expressed certainty that there were more because a person with only two ego fragments would be very uncommon.[13] During cross examination, the following exchange took place regarding Dr. Coffey's diagnostic conclusion that Mr. Lockhart suffered from DID, which diagnosis was made prior to the sodium amytal interview:

Q Okay. Now, when you made your initial diagnosis in 1988, you qualified your findings by noting that the diagnostic procedures customarily applied to make an unequivocal diagnosis of [DID] are quite lengthy and demanding of the clinicians' [sic] time and most often this determination is made during the course of a therapeutic relationship. You did not have that lengthy evaluation here; did you?

A. In 1988, I didn't apply as rigid a standard to my own willingness to make the diagnosis. Specifically, I didn't require myself to observe a switch from one ego to another. And I will simply state, without foundation, that I am a heck of a lot more knowledgeable in 1998 than I was in 1988 because I have continued to work and study, and I continue to work and study.

Q. But you did qualify your diagnosis, at that point?

A. Yes. I have no trouble with what I wrote in 1988.

Q. You qualified it in that the best diagnosis would be made after a therapeutic long term relationship?

A. Yes, or something like an intensive [amytal] interview.

With regard to his pre-sodium amytal interviews with Mr. Lockhart, Dr. Coffey stated that

"There were moments during the interview when I saw some of the signs that a switch in ego state was taking place or about to take place, but it never became clear cut.... [S]ome of the signs of an ego state switch, a shift in posture, a brief eye roll, I did observe."

In addition, Dr. Coffey's identification of a second ego state was based, in part, upon a change in Mr. Lockhart's voice during the sodium amytal interview, which allowed Dr. Coffey to *suspect* that he was talking to another ego state. Dr. Coffey admitted during cross-examination that he did not know absolutely that the voice change was, in fact, another ego state.

■ While we do not necessarily believe that an expert's opinion which is based on his own evaluation of a defendant should be assessed merely on the length of time the expert spent with the defendant, we are troubled that in the present case, apparently due to extreme time constraints placed upon him,[14] Dr. Coffey appears to have compromised his own evaluative standards. He ad-

---

13. With regard to his use of sodium amytal in diagnosing Mr. Lockhart, Dr. Coffey testified: When I am doing therapy with someone who whose [sic] psychopathology is like Mr. Lockhart's, *I would normally choose not to use sodium [amytal].* Because the process of therapy spans a substantial piece of time and I may not have time to get to the material that is repressed in other ways that are a little more gentle, when I only have one shot, as, for example, preparing for a trial, when I don't have the opportunity to build the relationship, to teach the skills for hypnosis, to relax the ego controls and get at the repressed material in gentler ways, I have to do something that I can accomplish in one session. (Emphasis added).

14. Possibly excluding the length of time devoted to the sodium amytal interview (Dr. Coffey could not clearly recall whether the sodium amytal interview occurred during one of his two 1995 or

mitted that he applied a less rigid than normal standard to his own willingness to make a diagnosis in this case. Dr. Coffey further stated that he would not normally choose to use sodium amytal in a case such as Mr. Lockhart's. Finally, Dr. Coffey's diagnosis appears speculative, and based on subtleties that merely allowed him to *suspect* that he was speaking with an alternate personality. Because Dr. Coffey was unable to clearly identify any alternate personalities and could not say which alternate personalities, or how many alternate personalities, participated in the crime, his testimony would not be helpful to a jury in determining the state of Mr. Lockhart's sanity at the relevant time. For these reasons, we are unable to conclude that the trial court abused its discretion in refusing to allow Dr. Coffey's testimony at trial.[15]

## IV.

## CONCLUSION

For the reasons explained in the body of this opinion, we find that expert testimony regarding Dissociative Identity Disorder *may* be admissible in connection with a defendant's assertion of an insanity defense. However, the admissibility of specific expert testimony regarding Dissociative Identity Disorder must be evaluated on a case-by-case basis. In this particular case, the trial court did not abuse its discretion by excluding such expert testimony. Consequently, the December 17, 1998, order of the Circuit Court of Wood County is affirmed.

Affirmed.

---

1996 one-and-one-half hour meetings with Mr. Lockhart, or whether the sodium amytal was given at a third meeting occurring during that time), Dr. Coffey spent a total of approximately eight hours with Mr. Lockhart. Five of those hours occurred in 1988, a time when Dr. Coffey admits his knowledge of DID was more limited than today. Three additional hours were spent with Mr. Lockhart approximately seven years later, following his commission of the crimes underlying the instant appeal, but no written report followed this later examination.

**15.** The fact that the circuit court may have rejected Dr. Coffey's testimony for reasons different

than those expressed in this opinion is of no consequence.

"This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." Syl. Pt. 3, *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965).

Syl. pt. 3, *State v. Boggess*, 204 W.Va. 267, 512 S.E.2d 189 (1998). *Accord Easterling v. American Optical Corp.*, 207 W.Va. 123, 133–34, 529 S.E.2d 588, 598–99 (2000).