# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent,**

**vs)  No. 16-0264** (Berkeley County 15-F-51)

**VINCENT SCOTT SMITH, JR.,**
**Defendant Below, Petitioner**

**FILED**

**March 1, 2017**

**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Vincent Scott Smith, Jr. (hereinafter "petitioner"), by counsel, Jason M. Stedman, Esquire, appeals the December 10, 2015, order of the Circuit Court of Berkeley County denying his motion for judgment of acquittal/motion for a new trial following his conviction of first degree felony murder and conspiracy to commit robbery.  Petitioner was sentenced to life in prison without parole.  On appeal, petitioner argues primarily that the evidence was insufficient to sustain the convictions.  He also asserts that the prosecuting attorney misstated the evidence during closing arguments, committed a "discovery violation," and that there were "flaws in the DNA evidence presented at trial." The State, by counsel, Cheryl K. Saville, Esquire, filed a response in support of the circuit court's findings.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented and upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

## I.  FACTUAL AND PROCEDURAL HISTORY

On September 14, 2014, Michael Garcia was found shot to death on Technology Road in Berkeley County, West Virginia.  Earlier in the day, Mr. Garcia was contacted by LaQuadia Grant on behalf of Tulsa Johnson, to arrange a heroin buy from him; Ms. Grant and Tulsa Johnson later picked up Jucobe Johnson and petitioner.  The group initially met at the apartment of Davon Adams, a friend of Mr. Garcia's who occasionally let him use his apartment to sell heroin.  Mr. Adams testified that upon arriving at Mr. Adams' apartment, Tulsa Johnson privately advised him that the group intended to "take" the drugs from Mr. Garcia and that he should not allow the transaction to occur in his apartment.  Mr. Adams then advised the group to leave, ostensibly because his children were in the apartment.  Mr. Adams testified that he did so to signal to Mr. Garcia that this was not an ordinary transaction and hopefully warn him of the group's intentions.

1

The group left the apartment; LaQuadia Grant returned to the vehicle in which she arrived, where Jucobe Johnson was waiting in the drivers' seat. Mr. Garcia, Tulsa Johnson, and petitioner left in Mr. Garcia's work vehicle and apparently traveled to a nearby cornfield. Shortly thereafter, Ms. Grant testified that Tulsa Johnson and petitioner returned to the car running from the direction of the cornfield. Ms. Grant testified that when they returned, Tulsa Johnson stated that she "killed that motherf*cker" and petitioner was wiping down a gun with a red bandana. Ms. Grant further testified that Tulsa Johnson and petitioner had a discussion about having "cleaned up" the scene and needing to dispose of the weapon.

Mr. Garcia's twin brother, Justin, testified that he was driving past the area of Technology Road when he observed Mr. Garcia's work vehicle sitting in the middle of the roadway and stopped to investigate. He testified that he found Mr. Garcia badly injured, lying in the roadway behind his vehicle, and that the pockets of his shorts were turned inside out. Justin testified that he searched for Mr. Garcia's cell phone to call 911 but did not locate it. Justin then traveled to the nearby home of Anthony Branson, with whom Mr. Garcia had been residing and had Mr. Branson accompany him back to the scene. Justin then left the scene before police arrived due to outstanding criminal warrants.

When police arrived, they found Mr. Garcia dead of multiple gunshot wounds; the fatal wound was found to have penetrated his heart. Investigators further observed disturbances in the nearby gravel suggesting a struggle. Mr. Garcia was found to have abrasions and dirt on his person. Investigators testified that no cell phone, wallet, or drugs were found on Mr. Garcia's person at the scene and that no cell phone was ever recovered. Testing of DNA found in the rear of Mr. Garcia's vehicle was insufficient to make a "unique" identification of petitioner, but an expert testified that she could not exclude petitioner as the source of the DNA. The "random match probability" was 1 in 12.3 billion.[1] A couple of days after the murder, Ms. Grant went to authorities and gave a statement consistent with her testimony as described above.

After a four-day consolidated trial, along with co-defendants Tulsa Johnson and Jucobe Johnson, petitioner and Tulsa Johnson were both convicted of first degree felony murder and conspiracy to commit robbery. Jucobe Johnson was acquitted of accessory after the fact to murder. The jury made no recommendation of mercy as to either defendant. Petitioner moved for a new trial arguing insufficiency of the evidence, which motion was denied by the trial court. This appeal followed.

---

[1] The expert testified that nine of fifteen "loci" matched petitioner; the remainder were insufficient to make a match. The "random match probability" indicates that only one in 12.3 billion people match this same nine of fifteen loci. Based on the expert's laboratory thresholds, the remaining loci were insufficient (*i.e.* "weak or partial") to allow a match of the remaining loci. Because she could not match the remaining six loci, the expert's lab protocols would not permit her to make a "unique identification" of petitioner.

## II. STANDARD OF REVIEW

Generally,

[i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). As pertains specifically to petitioner's primary assignment of error:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pts. 1 and 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). With these standards in mind, we proceed to petitioner's assignments of error.

3

## III. DISCUSSION

Petitioner sets forth six assignments of error, three of which involve insufficiency of the evidence. In his remaining assignments of error, petitioner asserts that the prosecutor misstated the DNA evidence in closing argument, the State committed a "discovery violation" involving a prior inconsistent statement of Mr. Adams', and that the DNA testing was "flawed."

First, petitioner argues that the State's evidence was insufficient to sustain the convictions of first degree felony murder and conspiracy to commit robbery, asserting that the evidence was "all circumstantial" and citing specifically the lack of an eyewitness to the actual shooting. Petitioner further argues that the State failed to produce sufficient evidence of the underlying crime upon which the felony murder rests—robbery.[2] Petitioner argues that investigators' mere failure to locate personal items, a cell phone, drugs, or money on Mr. Garcia's body at the crime scene is insufficient to prove robbery.

This Court has held:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some case[s] point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Guthrie*, 194 W.Va. at 668, 461 S.E.2d at 174 (quoting *Holland v. United States*, 348 U.S. 121, 139–40, 75 S. Ct. 127, 137–38, 99 L.Ed. 150, 166 (1954)). While there is no question the State presented a circumstantial case, the evidence at trial was fairly overwhelming. The unrefuted testimony demonstrated that the group concocted a plan to collect at Mr. Adams' apartment to obtain heroin from Mr. Garcia and that petitioner, Tulsa Johnson, and Mr. Garcia left the apartment in Mr. Garcia's vehicle to complete the transaction. LaQuadia Grant testified that shortly thereafter, Tulsa Johnson and the petitioner returned to the apartment complex without Mr. Garcia. Ms. Grant further testified that Tulsa Johnson declared she had "killed that motherf*cker," while petitioner was seen wiping down a gun; discussion was had about cleaning up the scene and disposing of the gun. Mr. Garcia's body was found shortly thereafter next to his vehicle in the area from which petitioner and Tulsa Johnson were seen running. Moreover,

---

[2] Petitioner also argues that there was insufficient evidence on the underlying felony of "delivery of a controlled substance," the alternate theory upon which petitioner was indicted. However, prior to instructing the jury, the trial court ruled that the State would not be permitted to submit the felony murder count to the jury on the theory of *delivery* of a controlled substance as described in W. Va. Code § 61-2-1 (1991) since there was no evidence that *receipt* of a controlled substance was sufficient evidence of such a violation. Accordingly, petitioner's argument in this regard is without merit. At no time did the State argue nor was the jury instructed that it could find felony murder on the basis of delivery of a controlled substance.

the evidence of robbery was presented through the testimony of Davon Adams, who testified that Tulsa Johnson advised him they intended to "take" the drugs from Mr. Garcia. In fact, no drugs, money, or other personal items were found on Mr. Garcia's body at the crime scene. As indicated previously, although this evidence is indeed circumstantial, it was met with little to no appreciable challenge, save various implications that Mr. Garcia's twin brother's discovery of his body and subsequent actions were arguably suspect. The jury was well-situated to weigh the credibility of the various witnesses and draw any inferences regarding petitioner's guilt. We therefore conclude that there was more than sufficient evidence upon which a reasonable jury could convict petitioner of first degree felony murder and conspiracy to commit robbery.

Next, petitioner argues that the circuit court erred by permitting the State to argue in closing that petitioner was identified from DNA located in Mr. Garcia's vehicle. Petitioner claims that this is a reversible misstatement of the evidence as the DNA expert merely testified that she could not *exclude* petitioner as the source of such DNA. The record shows that the expert testified she could not make a "unique identification" because certain of the DNA evidence was at a lower threshold than her lab permitted for purposes of making a unique identification. However, the expert could, and in fact did, testify that she could not exclude petitioner as the source of the DNA and that only 1 in 12.3 billion people would be a match to that degree.

This Court has held that "[a] prosecutor may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." Syl. Pt. 7, *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988). Moreover, "[t]he discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syl. Pt. 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927). Our review of the record reveals that, contrary to petitioner's contention, the prosecutor did not state that the expert had identified petitioner.[3] Rather, the prosecutor stated that the expert had testified petitioner could not be excluded, gave the statistical probability of a random match per the expert,[4] and then stated "what a coincidence." Accordingly, we find that the prosecutor did not misstate the evidence and her commentary regarding the expert's testimony was simply a reasonable inference to be drawn from the testimony.

---

[3] In fact, petitioner's trial counsel preemptively objected when the prosecutor began discussing DNA to ensure that she did *not* state that the expert conclusively identified petitioner. At the point that counsel objected, the prosecutor had stated only that "[w]e know Vincent Smith was in contact with Michael Garcia's car." We find that this statement is simply a reasonable inference from the evidence, particularly in light of the prosecutor's subsequent and accurate discussion of the expert's exact testimony.

[4] The expert testified that only 1 in *12.3 billion* people would randomly match the DNA analysis. In closing, the prosecutor mistakenly said it was *1 in 1.69 billion*. Although an error, the figure given by the prosecutor is actually less persuasive than the expert's testimony. In short, the mathematical misstatement was in petitioner's favor.

5

In his remaining two assignments of error, petitioner cursorily asserts 1) a "discovery violation" stemming from Mr. Adams' statement to police, which did not mention the group's plan to take anything from Mr. Garcia and was therefore "inconsistent" with his testimony at trial[5] and 2) the DNA testing was "flawed" because the experts were not aware that there was a "second set of identical twins" involved in the case.[6]

This Court is hard-pressed to discern the precise legal errors being asserted in these final two assignments of error and therefore declines to address them as insufficiently briefed. Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure provides that

> [t]he brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on . . . [and] must contain appropriate and specific citations to the record on appeal . . . . The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

Moreover, this Court by Administrative Order entered December 10, 2012, advised that "[b]riefs that lack citation of authority, fail to structure an argument applying applicable law, fail to raise any meaningful argument that there is error, or present only a skeletal argument" are not in compliance with this Court's rules. Further, "[a]lthough we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996); *see also State v. Lockhart*, 208 W.Va. 622, 627 n. 4, 542 S.E.2d 443, 448 n. 4 (2000) ("Assignments of error that are not briefed are deemed waived."). Accordingly, inasmuch as petitioner's remaining two assignments of error fail to coherently state a legal error or identify any legal authority, we decline to address them.

---

[5] Although initially couched as part of his insufficiency of the evidence argument, without further explanation or supporting legal analysis, petitioner asserts this was a "discovery violation." As the State notes, petitioner cross-examined Mr. Adams on his prior statement, a copy of which petitioner was provided by the State. In fact, petitioner does not contend the State failed to provide him with the statement, rather, he laments simply that it was inconsistent with Mr. Adams' testimony at trial. To whatever extent this bears on the sufficiency of the evidence, obviously the jury was unpersuaded by this attempted impeachment.

[6] As noted, the victim, Mr. Garcia, was an identical twin; however, apparently Ms. Grant is also an identical twin. Petitioner fails entirely to discuss what, if any, significance Ms. Grant's twin is to the DNA analysis as none of her DNA was found at the scene nor had any bearing whatsoever on the evidence at trial. To the extent petitioner is actually referring to the victim's twin and the significance of that evidence as pertains to the actual DNA evidence, the expert testified that she would like to have a DNA sample from Mr. Garcia's twin (Justin) to ensure they were identical, but did not have a sample. This is significant only insofar as DNA matching Mr. Garcia was found on a Corona bottle in the vehicle. However, there is no explanation by petitioner as to how Mr. Garcia having a twin would impact the non-inculpatory presence of the victim's DNA at the scene.

6

## IV. CONCLUSION

For the reasons set forth above, this Court affirms the December 10, 2015, order of the Circuit Court of Berkeley County.

Affirmed.

**ISSUED:** March 1, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry, II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker